# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 26, 2011

## STATE OF TENNESSEE v. CHRISTOPHER VIGIL

**Appeal from the Criminal Court for Washington County**
**No. 33764    Lynn W. Brown, Judge**

---

**No. E2011-00259-CCA-R3-CD - Filed February 9, 2012**

---

Appellant, Christopher Vigil, appeals from his conviction for criminally negligent homicide. As a result of the conviction, Appellant was sentenced to two years in incarceration. On appeal, Appellant challenges the sufficiency of the evidence and his sentence. We determine that the evidence was sufficient to support the conviction for criminally negligent homicide where the proof showed Appellant was engaged in conduct that he knew, or should have known, created a substantial and unjustifiable risk to the victim and constituted a gross deviation from the standard of care of an ordinary person under those circumstances and that Appellant's actions proximately caused the victim's death. Further, the trial court properly sentenced Appellant to two years where the record indicated Appellant had a "significant" prior criminal history. Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Steve McEwen, Mountain City, Tennessee, (on appeal), and William L. Francisco, Johnson City, Tennessee, (at trial), for the appellant, Christopher Vigil.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Anthony Clark, District Attorney General; and Janet Hardin, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

Appellant was indicted by the Washington County Grand Jury in September of 2007 for especially aggravated kidnapping. In November of 2008, a superceding indictment was issued, charging Appellant with reckless homicide and leaving the scene of an accident. The charge for leaving the scene of an accident was later dismissed. The case proceeded to trial where Appellant was convicted of the lesser included offense of criminally negligent homicide. After a sentencing hearing, Appellant was sentenced as a Range One, Standard Offender to two years in incarceration.

At trial, the proof indicated that Appellant and Frannie Berry, the victim, were in an "on and off" relationship that had been ongoing for several years. Occasionally, when the two would get into an argument, the victim would stay with Michelle Marlor, a friend.

In early April of 2007, the victim came to stay with Ms. Marlor. She brought a lot of her personal items to the house. The victim stayed with Ms. Marlor for several days and told her that she had stopped communicating with Appellant. Appellant continued to call and send text messages to the victim. At one point, Appellant even left a voicemail for the victim telling her that she would be sorry if she did not return his calls.

On April 12, 2007, the victim talked to Appellant on the phone. After the conversation, she was upset. The following morning, when Ms. Marlor left for work, the victim was sitting on the front porch crying. Ms. Marlor later received a telephone call from the victim. The victim told her that she was with Appellant at the time. When Ms. Marlor returned home from work, all of the victim's possessions were gone.

On the afternoon or early evening of April 13, 2007, Thomas Ditto was working at the Appco convenience store on Greenwood Drive in Washington County, Tennessee. Mr. Ditto saw a short, stocky female with blond hair get out of a red Corvette and come into the store. Appellant was driving the Corvette and remained in the car. The woman "hollered" for Mr. Ditto to turn on the gas pump. Appellant put gas in the car and then came inside the store to say something to the woman. According to Mr. Ditto, the woman "snapped" at Appellant, who then left the store. The woman paid for the gas and walked back to the car. Mr. Ditto saw the couple "exchange[] a few words." He described the conversation between Appellant and the woman as "loud and argumentative."

Mr. Ditto then saw the couple get into the Corvette. As the car was leaving the parking lot, Mr. Ditto saw the passenger door open and one foot come out of the car. The

passenger door then closed. Mr. Ditto then heard squealing tires, and saw the car reverse quickly into a parking space where it remained for fifteen to twenty minutes. During that time, the couple's body language and the noise emanating from the vehicle indicated that they were in a heated argument. During the argument, Appellant put his hand up and "swiped" it toward the woman. The woman reacted to the motion, but Mr. Ditto could not tell if Appellant actually struck the woman with his hand.

Mr. Ditto observed the couple sit in the car for about five to ten more minutes before Appellant backed the car out of the parking space and turned right onto Greenwood Drive. Mr. Ditto saw the passenger door open again while the car was moving. The woman's foot came out of the car, as if she was trying to get out. Then, Mr. Ditto saw the woman's body make a "jerking motion backwards into the car." Mr. Ditto thought that the door closed on its own as the car sped off. He lost sight of the car. A short time later, he saw a lot of cars on the street moving slowly and heard sirens.

Jill Cantrell Moore was pulling out of the carwash on Greenwood Drive on April 13, 2007, when she saw a Corvette driving "very fast" down the street with the passenger door open. She could see a woman inside the car screaming with her "arms and legs just flailing about almost like outside the car where the car door was opened." Ms. Moore saw the driver of the car holding onto the woman's hair. It was not clear whether the driver was pushing or pulling the woman. Ms. Moore called 911 and followed the car. Just down the street, she saw the woman who had been in the Corvette lying face down in the middle of the street.

The driver of the Corvette approached the woman lying in the street and said something awkward like, "what are you doing grandma." Ms. Moore could not understand if the man was saying grandma or "Frannie." The man screamed and left the scene. The woman was unconscious and had obvious head injuries. The man did not offer to help.

Kim Phillips, a registered nurse, was driving to work when she saw the victim lying in the road. She stopped to help. She recalled that the victim was breathing and had a pulse but observed blown pupils and bleeding. The victim was unresponsive. Ms. Phillips spoke to the 911 dispatcher on the phone, followed the woman to the hospital, and helped to treat her in the intensive care unit. The woman remained unresponsive.

Robert A. Montgomery, Jr., was also in the area when the victim was injured. He was driving south on Greenwood Road when he saw a woman "rolling in the road" just ahead of the car in front of him. He stopped and pulled over to check on the woman. Mr. Montgomery saw the male driver of a Corvette parked about 100 feet from the woman. The man did not offer assistance and told people to "stay away" from the woman and "leave her alone." The man got in his car and drove south at a high rate of speed.

Sterling L. Myers also stopped at the scene and saw Appellant get out of a Corvette parked down the road. He thought Appellant's behavior was strange. Appellant clapped his hands and jumped up and down. Appellant left the scene without offering assistance.

Another witness, Kristin Kaudewitz, also saw Appellant at the scene, jumping up and down, pacing back and forth, and waving his hands over his head. She described Appellant as "frantic" and "hysterical" but noticed that Appellant did not help before returning to his car and leaving the scene.

Investigator Brett Richardson of the Johnson City Police Department responded to the scene. By the time he arrived, the victim had been transported to the hospital. He observed drag marks and a large pool of blood in the street. Investigator Richardson did not notice anything that would have prevented a car from pulling over to the shoulder of the road near the victim.

Based on witnesses at the scene, Appellant was developed as a suspect. Appellant left the scene and went to his mother's house on Lone Oak Drive. Appellant's mother called the police.

Appellant spoke with police that afternoon, agreeing to a videotaped statement. During the statement, Appellant claimed that it was "possible" he and the victim were "fussing"with each other at the gas station. Appellant denied hitting the victim. He claimed that the victim was upset with him because she "thought [he] had been with someone else." Appellant told the victim that if she was going to "run her mouth" she could "get out of the car right now." Appellant claimed that the victim acted like she was going to get out of the car but did not. The victim then told Appellant to let her out of the car. The car was going about thirty miles per hour at the time. Appellant slowed the car, and the victim tried to get out. Appellant claimed that he pulled her back into the car part of the way, but the victim's feet and legs were hanging out of the car. Appellant then claimed that the victim "fell out of the vehicle." Appellant stopped the car and walked back to the victim. He "saw blood" but "didn't call 911." Appellant informed police that he went to his mother's house where he called 911.

The victim was admitted to the hospital where she was diagnosed with an acute subdural hematoma on the right side of her head, a skull fracture, and bilateral pulmonary contusion versus consolidation. The victim was discharged to another facility in May with a traumatic brain injury. The victim later died as a direct result of complications from the original trauma.

At the time of the injuries, the victim was twenty-nine years of age and married to Curtis Berry. The victim had three children.

After the incident, Appellant was seen by Christopher Hicks at a barber shop. Appellant explained to Mr. Hicks that he and the victim were arguing in the car on the day of the incident when the victim smacked at him. Appellant told Mr. Hicks that he pushed the victim. Appellant also told Mr. Hicks that he had "maxed out" his credit cards and bought a motorcycle because he knew that he "could not beat the charges [against him]." Mr. Hicks stated that Appellant did not show any emotion when talking about the victim. Mr. Hicks described Appellant as a person with a temper.

At the conclusion of the proof, the jury found Appellant guilty of criminally negligent homicide.

The trial court held a separate sentencing hearing. At the conclusion of the hearing, the trial court sentenced Appellant to two years as a Range I, standard offender.

Appellant filed a timely notice of appeal.

*Sufficiency of the Evidence*

Appellant challenges the sufficiency of the evidence on appeal. Specifically, Appellant argues that the evidence does not show that Appellant's actions "deviated from the standard of duty of reasonable care and proximately caused [the victim's] death." Further, Appellant argues that the victim's own negligence caused her death. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S .W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is

precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Criminally negligent homicide is defined as "[c]riminally negligent conduct which results in death." T.C.A. § 39-13-212(a).

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-106(a)(4).

Viewing the evidence in a light most favorable to the State, the evidence shows that "the victim's death was the natural and probable result of the defendant's unlawful conduct." *State v. Farner*, 66 S.W.3d 188, 202 (Tenn. 2001). Leading up to the incident, the proof showed that Appellant and the victim had a rather torrid relationship. The victim was staying with a friend because she had been arguing with Appellant. The two were seen arguing on the day of the offense and at least one witness saw Appellant swipe his open hand toward the victim, causing her to react. The victim was seen at least twice with her foot dangling out of the passenger door of the car while Appellant was driving. The victim was screaming and flailing about in the car as it was driving "very fast" down the road. Appellant did not stop the car in order for the victim to exit safely. Appellant later admitted that he did not pull over and assist the victim when she was injured. From these facts, a jury could have concluded that Appellant engaged in conduct that he knew, or should have known, would have created a substantial and unjustifiable risk to the victim and constituted a gross deviation from the standard of care of an ordinary person under those circumstances. The evidence was sufficient to support the conviction. Appellant is not entitled to relief.

*Sentencing*

Appellant insists that the trial court improperly sentenced him to serve two years for the conviction for criminally negligent homicide. Specifically, he argues that the trial court based the decision to sentence him to two years "solely upon his prior criminal record," ignoring the fact that one of Appellant's prior convictions had been vacated as "violative of the double jeopardy clause." The State contends that the trial court considered the appropriate factors in sentencing Appellant.

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40–35–401(d). "[T]he presumption of correctness 'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If . . . the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." *Id.* at 345 (citing *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992)). We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination, a trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts regarding sentences for similar offenses; (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). When imposing the sentence within the appropriate sentencing range for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2006).

At the outset we note that Appellant committed the criminal offenses at issue in April of 2007; therefore, the 2005 amendments to the Sentencing Act apply to our review of his sentencing. The 2005 amendments to the Sentencing Act made the application of the enhancement factors advisory in nature. *See* T.C.A. § 40-35-114; *State v. Jackie Lynn Gray*, No. M2007-02360-CCA-R3-CD, 2008 WL 2579175, at *5 (Tenn. Crim. App., at Nashville, June 28, 2008), *perm. app. denied*, (Tenn. Dec. 29, 2008); *State v. Troy Sollis*, No. W2007-00688-CCA-R3-CD, 2008 WL 1931688, at *3 (Tenn. Crim. App., at Jackson, May, 2, 2008). In fact, "[t]he 2005 amendments [to the sentencing act] deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008).

After a review of the transcript from the sentencing hearing, it is clear that the trial court considered the nature and characteristics of the criminal conduct involved, Appellant's history and background, the mitigating and enhancement factors, and the principles of sentencing. *See id.* at 345-46. Therefore, there is a presumption that the trial court's determination is correct. The trial court applied one enhancement factor: that Appellant had "a previous history of criminal convictions." T.C.A. § 40-35-114(1). With regard to Appellant's previous history of criminal convictions, the trial court stated that Appellant's previous history was "significant," specifically noting convictions for underage consumption of alcohol, assault, domestic violence, driving under the influence, driving on a revoked license, stalking, and others that were misdemeanors. The trial court and the State noted that the stalking conviction was similar to the facts in the present case. The trial court determined that Appellant was a Range I, standard offender and was subject to a sentencing range of one to two years. After application of the enhancement factor, the trial court sentenced Appellant to two years.

Appellant argues that the trial court improperly enhanced his sentence in part due to the fact that one of the convictions for stalking was vacated on appeal. *See State v. Vigil*, 65

S.W.3d 26 (Tenn. Crim. App. 2001). To the contrary, the trial court recognized during the hearing that one of the two prior stalking convictions was reversed on appeal. As stated above, the trial court specifically relied on the number of Appellant's prior convictions when the court was applying that enhancement factor. Even if the trial court had erroneously considered the stalking conviction that was reversed, the record amply supports the enhanced sentence. Appellant certainly had several remaining prior criminal convictions that justified enhancing the sentence one year. Therefore, this issue is without merit.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.


_____
JERRY L. SMITH, JUDGE